**JEWEL TEA CO. v. WILLIAMS et al.**
**No. 2185.**

Circuit Court of Appeals, Tenth Circuit.
March 6, 1941.

As Modified April 15, 1941.

James F. Oates, Jr., of Chicago, Ill. (Richard D. Sturtevant, of Barrington, Ill., George W. Ball, of Chicago, Ill., Eldon J. Dick, of Tulsa, Okl., and Sidley, McPherson, Austin & Burgess, of Chicago, Ill., on the brief), for appellant.

W. L. Shirey, of Tulsa, Okl. for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

This is an appeal from a judgment against the Jewel Tea Company[1] awarding J. O. Williams, Carl Ransdell, and S. W. Mead[2] overtime compensation, liquidated damages, and attorney's fees under the provisions of § 16(b) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219.

The facts hereinafter stated obtained during the periods of employment involved herein.

The Company is a New York corporation engaged in the business of manufacturing, selling, and distributing at retail, coffee, tea, extracts, baking powder, laundry and toilet soaps, and other similar merchandise. It maintains a central manufacturing and distributing plant at Barrington, Illinois. It also maintains branch establishments in various cities throughout the United States, one of which is located at Tulsa, Oklahoma. The employees and twelve others were employed by the Company as route salesmen[3] to sell and distribute at retail the Company's products from the Tulsa branch, to customers in their homes, in prescribed territories in and about Tulsa. All the above-mentioned salesmen worked exclusively within the state of Oklahoma. One additional salesman from the Tulsa branch worked in Arkansas. Approximately 15/16ths of the Tulsa branch sales were made entirely within Oklahoma.

The plan under which the Company conducts its business at its several branches may be thusly described: Each salesman is assigned an exclusive territory which he covers in a light sedan delivery car owned by the Company. His territory is divided into 12 days' business, each day represented by a route book containing the accounts of customers to be served on that day. It takes 12 working days or two full weeks for each salesman to cover his route and each customer is served once every two weeks on the same day of the week. A salesman does not make sales for immediate delivery, but takes orders for merchandise which he delivers on the next call two weeks later. In order to secure and maintain the regular patronage of his customers the salesman advances to the customer with the first delivered order for coffee or groceries some useful household article as a premium. This premium is charged to the customer's account with the understanding that the charge may be traded out by profit-sharing credits which are allowed in specified amounts on each grocery item purchased. As the balance due on the premium decreases, the salesman attempts to place additional premiums with the customer. Any customer may at any time pay in

---

[1] Hereinafter referred to as the Company.

[2] Hereinafter referred to collectively as the employees.

[3] Route salesman will hereinafter be referred to as salesman and where the plural form is used, as salesmen.

cash the balance due on the premium account and discontinue trading with the Company.

The Company does no advertising, either national or local. Instead, it relies exclusively upon the individual sales efforts of its salesmen to create demand for its products.

The salesmen are employed under written contracts, the form of which has not been changed since 1937. In the contracts they are designated as salesmen and the provisions of the contracts are consistent with that designation. These contracts require salesmen to devote their entire time and best efforts to build up and keep trade for the Company, to sell all merchandise furnished by the Company for sale, and to solicit and take orders for merchandise. They provide that the salesmen shall sell all merchandise furnished by the Company at the prices established by the Company and keep a true and just account of all such transactions. They provide for the compensation of salesmen at base salaries, plus a graduated scale of commissions on collections above a certain figure.

A salesman is expected to call each day on all customers listed in his route book, which contains the names not only of those customers to whom merchandise is to be delivered in fulfillment of orders taken two weeks before, but also customers who did not place an order on the salesman's last call. In addition to the accounts in his route book, the salesman is expected to call on other potential customers and to obtain at least three new customers each week. A salesman ordinarily spends 8 to 10 minutes in the customer's home. He first delivers and collects for merchandise sold on his last call. This takes 2 to 3 minutes. The remainder of the time is devoted to salesmanship.

When a salesman is employed, the Company places great emphasis on his selling ability and before giving him a route, carefully trains him over a period of one to three weeks in selling methods and techniques. Thereafter, he is started on a route with an assistant sales manager, who stays with him for two weeks. He is then permitted to go out on a route by himself. Two or three weeks later he is given another sales course by the assistant sales manager who goes with him on his route for another two weeks' period to find out how he is progressing. After that, he receives periodical training and one night every two weeks he is required to attend a meeting of the Next Door Neighbor Club, an organization sponsored by the Company for the instruction and welfare of its salesmen. In connection with its training program, the Company has developed a sound film which illustrates methods of sale. The Company presents a different program for each two weeks' selling period. Two-thirds of the time spent in these biweekly meetings is devoted to a discussion of sales problems by the sales manager and a presentation of the sales program to become effective the following Monday. In the training course, salesmen are taught the following method, designated as a five-point sale: The salesman first delivers and collects for merchandise previously ordered, if any, and posts the customer's account. He next calls the customer's attention to previous orders and suggests other products in which the customer may be interested, elaborating on the merit of those products. He reviews with the customer a copy of the Jewel News, a publication distributed only by salesmen, and emphasizes certain items which are featured in the current number of that publication. He then calls the customer's attention to the premium special, which is a low-priced item that can be sold for cash if the customer purchases certain extra items. Next, the salesman stresses certain dramatized items by the method described in one of the Company's pamphlets. The salesman is also furnished with seasonal products and a pamphlet gives him detailed instructions as to how these items can best be sold. Finally, the salesman presents the particular premium selected for emphasis that week which, for example, may be a china teapot or aluminum ware. Before leaving, the salesman is expected to obtain from the customer the name and address of one of the customer's friends or relatives who might be interested in becoming a Jewel customer. Such names and addresses furnish the salesman his best opportunity to obtain new customers and increase the earnings from his route.

The salesman must know recipes for the preparation of the Company's products and must be able to show the housewife how they are best prepared for consumption. He must learn the general requirements of each family, in order to avoid overstocking his customer and in order to anticipate the family's needs.

Salesmen are expected to report for work at 7 A. M. each week day, in order that

the first call at a customer's house shall be made not later than 8 A. M. There is no fixed or established quitting time. They are required to do certain clerical work, part of which is customarily done at home in the evening.

Orders taken by salesmen are filled from the branch out of which they work which is in charge of a stock manager. It is the duty of the stock manager to maintain constantly a sufficient supply of merchandise to fill the orders to be taken in the future by salesmen. In order to maintain an adequate stock of goods on hand at all times, it is the regular practice of the Tulsa stock manager to order goods every other Saturday. In determining the amounts of the various items to order, he ascertains from a weekly inventory ledger kept by him the total stock depletion of those items for the preceding four weeks, subtracts the quantity still on hand and orders the difference. Special and seasonal items not regularly required in the business are sent to the Tulsa branch from the Barrington Plant on an allotment basis without previous order from the branch. No articles are ever obtained from Barrington by the stock manager for specific customers. He replenishes his stock in carload lots, and in making up his orders does not take into consideration the amount and nature of customers' unfilled orders on hand, but is guided solely by his record of prior stock depletions of the various items. No merchandise is ever sent directly to customers from Barrington or from elsewhere outside the state of Oklahoma, and no items or articles are otherwise marked. or identified as being merchandise purchased by any particular customer.

Merchandise is ordinarily received in carload lots at the Tulsa branch about ten days after the stock manager sends in his order or requisition. The stock manager places all such shipments in the branch warehouse, arranging the different items in an orderly manner, so that he can conveniently fill the salesmen's orders for delivery to the customers. New stock is not kept separate from old stock, except that incoming merchandise is placed behind stock on hand, so that the older stock will move out first.

The average value of the stock of merchandise constantly maintained at Tulsa is $11,000, while the total weekly sales of the salesmen working out of the Tulsa branch average $2,500. There is thus maintained, on the average, a supply of goods sufficient to meet salesmen's future orders for a period of approximately four weeks.

The annual gross receipts of the Company from sales made by its salesmen exceed twenty million dollars.

The route books of Williams showed an average of 50 accounts. In covering his route, Williams traveled an average of 188 miles per week.

The contract under which Williams was employed during the period from October 24, 1938 to December 5, 1938 provided for a base salary of $20.50 per week and for commissions on weekly collections in excess of $176. From December 5, 1938 to February 21, 1939 his base salary was $21 per week with commissions on collections in excess of $151. Williams received the amount specified in his contract and in addition the sum of $44 on December 3, 1938, as added compensation. Ransdell and Mead worked on base salaries of $21 per week with commissions on weekly collections in excess of $151. None of the appellees earned any commissions, although, as shown by the Company's records, compensation as high as $128 per week had been earned under like contracts.

It does not appear that either the Company or the employees kept any record of hours worked by the latter.

The trial court found that each of the employees worked a total of 70 hours per week during the period of his respective employment within the first effective year of the Fair Labor Standards Act of 1938.

The trial court found that the salesmen were not engaged in the production of goods for interstate commerce or in any activities necessary to such production, but concluded from the facts above stated that the goods traveling from Barrington to the household of the consumer constituted an uninterrupted stream of interstate commerce, and that the employees in performing their duties as salesmen were engaged in interstate commerce.

The trial court found that Williams worked 26 hours per week overtime for a period of 17 weeks; that Ransdell worked 26 hours per week overtime for a period of 34 weeks; and that Mead worked 26 hours per week overtime for a period of 15 weeks.

The trial court arrived at an hourly rate of pay by dividing the weekly salary paid by the 70 hours found to have been worked

by each of the employees. Using this method of computation, the court fixed Williams' hourly rate of pay from October 24, 1938 to December 5, 1938, at 29¢ per hour and from December 5, 1938 to February 21, 1939, at 30¢ per hour. On the basis of these rates, the court calculated the overtime at time and a half the hourly rate so determined, and awarded Williams overtime compensation and liquidated damages totaling $394.48. Using the same method of calculation and an hourly rate of pay of 30¢, the court awarded Ransdell overtime compensation for a period of 34 weeks and liquidated damages amounting to $795.60, and Mead overtime compensation for a period of 15 weeks and liquidated damages amounting to $351.

Sec. 7(a) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 207(a), provides that no employer shall employ an employee "who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty-four hours" during the period from October 24, 1938 to October 23, 1939, "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[ ] The Act by its terms is limited to employees engaged in interstate commerce or in the production of goods for interstate commerce. It does not extend to employment that merely affects interstate commerce.[4]. If there could be doubt as to the correctness of this interpretation, it is set at rest by the legislative history of the Act.[5]

[ ] Where orders are solicited within a state and the goods are shipped from without the state directly to the customer or to the agent for delivery to the customer in fulfillment of specific orders, the transactions are held to be interstate commerce.[6] But the facts in the instant case distinguish it from those cases.[7] Here, the orders for merchandise forwarded by the branch manager to Barrington were not predicated on salesmen's orders on hand, but were based solely on the stock on hand and prior depletions thereof, and were made with a view to replacement of stock depletions and to fill anticipated demand or future orders. Sufficient stock was always on hand to fill the orders of salesmen at the time they

---

[4] See Federal Trade Commission v. Bunte Bros., Inc., 61 S.Ct. 580, 85 L.Ed. ——, decided February 17, 1941;

Foster v. National Biscuit Co., D.C. Wash., 31 F.Supp. 552;

Gates v. Graham Ice Cream Co., D.C. Neb., 31 F.Supp. 854;

Bagby v. Cleveland Wrecking Co., D. C.Ky., 28 F.Supp. 271;

Interpretative Bulletin No. 1, issued by the office of General Counsel for the Wage and Hour Division of the United States Department of Labor, October 12, 1938.

[5] Senate Bill 2475, as introduced and as it passed the Senate, was limited to employees engaged in interstate commerce or in the production of goods for interstate commerce. The House, by amendment, broadened the coverage of the bill by requiring time and a half for overtime for all employees of an "employer engaged in commerce in an industry affecting commerce." 75th Cong., 3rd Sess., H.Rep. 2182.

The conference draft of the bill, which was finally enacted into law after the Senate had refused to accede to the House amendment, restored the test of coverage contained in the original Senate bill, by applying the act to "employees . . . engaged in commerce or in the production of goods for commerce." Senator Pepper of Florida, a member of the Conference Committee which drafted the act as adopted, made its limited scope very clear in discussing the terms of § 7 before the Senate. In answer to an objection to the broad scope of the act, he said:

"I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. It is applicable only to those employees who themselves are engaged either in interstate commerce, or the production of goods for interstate commerce, and the contrary theory was definitely rejected by the Committee." 83 C.R. 9168 (Senate— 75th Cong., 3rd Sess., June 14, 1938).

[6] Robbins v. Shelby Taxing District, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694;

Brennan v. Titusville, 153 U.S. 289, 14 S.Ct. 829, 38 L.Ed. 719;

Rearick v. Pennsylvania, 203 U.S. 507, 27 S.Ct. 159, 51 L.Ed. 295;

Crenshaw v. Arkansas, 227 U.S. 389, 33 S.Ct. 294, 57 L.Ed. 565;

Real Silk Hosiery Mills v. Portland, 268 U.S. 325, 45 S.Ct. 525, 69 L.Ed. 982.

[7] See Wagner v. City of Covington, 251 U.S. 95, 103, 104, 40 S.Ct. 93, 64 L.Ed. 157, 168;

Armour Packing Co. v. Lacy, 200 U.S. 226, 233, 26 S.Ct. 232, 50 L.Ed. 451.

were obtained and orders were always filled out of stock on hand and not from new stock received after the orders were obtained. The old stock moved out first and the new stock simply replaced it. Goods shipped from Barrington to the branch in Tulsa came to rest in Oklahoma and became commingled with the mass of goods already within the state, and they were there held solely for local distribution and use so far as the activities of the employees were concerned.

Where goods are ordered and shipped in interstate commerce to meet the anticipated demands of customers without a specific order therefor from the customer and the goods come to rest in a warehouse, the interstate commerce ceases when the goods come to rest in the state. It does not continue until the demand eventuates in the form of an order and the merchandise is delivered to the retailer.[8]

The mere fact that an anticipated local transaction causes a movement in interstate commerce is not sufficient to constitute the local transaction a part of interstate commerce.[9] The language of the Supreme Court in Schechter Corporation v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947, is apposite:

"The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce had ceased. The poultry had come to a permanent rest within the state. It was not held, used, or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states. Hence, decisions which deal with a stream of interstate commerce— where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here."

Sec. 13(a) of the Fair Labor Standards Act of 1938 provides that "the provisions of section * * * 7 [207] shall not apply with respect to * * * any employee employed * * * in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)."

Sec. 3(k) thereof provides that " 'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."

The term "outside salesman" is defined in an Amendment to Regulations, Part 541, promulgated by the Administrator of the Wage and Hour Division in the Department of Labor, as follows:

"The term 'employee employed * * * in the capacity of outside salesman' in section 13(a)(1) of the act shall mean any employee—

"(A) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in—

"(1) Making sales within the meaning of section 3(k) of the act; * * *

"(B) * * * provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work."

The reasons for excluding an outside salesman are fairly apparent. Such salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much

---

[8] See Lipson v. Socony Vacuum Corporation, 1 Cir., 87 F.2d 265.

See, also, Winslow v. Federal Trade Commission, 4 Cir., 277 F. 206, 207-209, certiorari denied, 258 U.S. 618, 42 S.Ct. 271, 66 L.Ed. 793;

Ward Baking Co. v. Federal Trade Commission, 9 Cir., 264 F. 330;

Atlantic Coast Line R. Co. v. Standard Oil Co. of New Jersey, 4 Cir., 12 F. 2d 541, 60 A.L.R. 1456;

Wagner v. City of Covington, 251 U. S. 95, 104, 40 S.Ct. 93, 64 L.Ed. 157, 168;

Armour Packing Co. v. Lacy, 200 U.S. 226, 233, 26 S.Ct. 232, 50 L.Ed. 451;

Kehrer v. Stewart, 197 U.S. 60, 64, 65, 25 S.Ct. 403, 49 L.Ed. 663.

[9] Lipson v. Socony Vacuum Corporation, 1 Cir., 87 F.2d 265, 267;

Moore v. New York Cotton Exchange, 270 U.S. 593, 604, 46 S.Ct. 367, 70 L. Ed. 750, 45 A.L.R. 1370;

Ware & Leland v. Mobile County, 209 U.S. 405, 412, 413, 28 S.Ct. 526, 52 L. Ed. 855, 14 Ann.Cas. 1031.

or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

Here, the salesmen were primarily employed to effect sales of the Company's merchandise. They were not routine delivery men. The articles delivered were small and could be handled with little physical effort. Their efforts were chiefly devoted to effect sales and delivery was merely incidental to sales. The greater portion of their time was devoted to salesmanship and only a small part to delivery of goods ordered. Under their contracts, they were employed as salesmen. Their earnings were based on a commission determined by the total amount of goods sold. They were selected because of their ability as salesmen. They were given initial training before they undertook their duties and were continuously trained during their employment in the art of salesmanship.

We conclude that the employees were "outside salesmen" as the term is used in § 13(a) (1) of the Act, and as defined by the Regulations, and were exempt from the provisions of § 7(a).

The judgment is, therefore, reversed and the cause is remanded with instructions to enter a judgment dismissing the action with prejudice and awarding the company its costs.