**GERDERT et al. v. CERTIFIED POULTRY & EGG CO., Inc., et al.**

No. 185-M Civil.

District Court, S. D. Florida, Miami Division.

April 29, 1941.

Paul H. Brinson, of Coral Gables, Fla., and Walsh & Ellis, of Miami, Fla., for plaintiffs.

Louis Heiman and Stanley C. Myers, both of Miami, Fla., for defendants.

Gerard D. Reilly and Irving J. Levy, both of Washington, D. C., and Geo. A. Downing and William A. Lowe, U. S. Department of Labor, both of Atlanta Ga., for Philip B. Fleming, Administrator of the Wage and Hour Division, U. S. Department of Labor, as amicus curiae.

WALLER, District Judge.

The question involved is whether or not a wholesale merchant, who acquires the vast proportion of his merchandise in other states but who sells no goods outside the State of Florida, is engaged in interstate commerce so as to bring his employees under the provisions of the Federal Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.

■ Without doubt, Congress had the *power* to regulate purely local transactions that injuriously affect interstate commerce or the free flow of goods in interstate commerce. See United States v. Darby, 61 S. Ct. 451, 85 L.Ed. ——.

It will be necessary, therefore, to examine the Fair Labor Standards Act to ascertain whether or not Congress, in the regulation of wages and hours under the Act, made it applicable to situations adversely affecting interstate commerce, or if the Act is only applicable to interstate commerce as it is generally defined. Section 206, Paragraph (a), Title 29, U.S.C.A., provides that: "Every employer shall pay to each of his employees *who is engaged in commerce or in the production of goods for commerce* wages at the following rates —" etc.

Paragraph (a) of Section 207, Title 29, U.S.C.A., provides: "No employer shall, except as otherwise provided in this section, employ any of his employees *who is engaged in commerce or in the production of goods for commerce—*" etc.

Section 215(a) provides:

"After the expiration of one hundred and twenty days from the date of enactment of this chapter, it shall be unlawful for any person—

"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 * * *."

■ Thus it is that the *employee* must be either: (1) Engaged in commerce; (2) engaged in the production of goods for commerce; or (3) engaged in the shipping, delivery, or sale of goods of the employer which the employer knew were to be shipped, delivered, or sold in interstate commerce. The Act, therefore, is not applicable to employees engaging in intrastate commerce except in the production of goods for commerce or in the local shipment, delivery, or sale of goods produced with knowledge that shipment, delivery, or sale in interstate commerce was intended.

In the recent case of Jewel Tea Company v. Williams et al., 10 Cir., 118 F.2d 202, 206, decided March 6, 1941, the Court said: "The Act by its terms is limited to employees engaged in interstate commerce or in the production of goods for interstate commerce. It does not extend to employment that merely affects interstate commerce. If there could be doubt as to the correctness of this interpretation, it is set at rest by the legislative history of the Act."

■ This Court, in Fleming, Administrator, v. Enterprise Box Company, 37 F. Supp. 331, in a case arising at Tampa in the Southern District of Florida, has held that even though the goods produced were sold only locally and not directly in interstate commerce, if the manufacturer knew that shipment, delivery, or sale in interstate commerce was intended the Fair Labor Standards Act applied; that even though the manufacturer was not, strictly speaking, engaged in interstate commerce, but was engaged in a local business and was engaged only in the manufacture of commodities for local sale, yet he knew that

968

sale in interstate commerce was intended, and was, therefore, within the provisions of the law; that Congress had the power to regulate transactions, which, when isolated, were purely local, which affected the free flow of goods in interstate commerce. But it appears that the production of goods for commerce, or sale with knowledge that the goods were intended for sale, shipment, or delivery, in interstate commerce, are the only provisions of the Fair Labor Standards Act that regulate purely local activities. The Act does not provide that if the employer, and consequently the employees, are engaged in a business which *affects* interstate commerce the Act shall be applicable, but it provides only that if it is engaged in the *production of goods* for commerce, or sale with knowledge that same is intended to be sold in interstate commerce then the Act would apply. Therefore, the only attempted regulation of local activities by the Act is in the production and sale of goods in commerce or in the production of goods with knowledge that sale, shipment, or delivery in commerce is intended. Jewel Tea Company v. Williams, supra.

Unquestionably Congress had the right to regulate *any* local activity of goods that had moved in interstate commerce where such activity would be calculated adversely to affect interstate commerce, but it is significant that in the Fair Labor Standards Act Congress did not mention employments adversely affecting interstate commerce except as to goods produced for commerce or produced or sold with knowledge that shipment in interstate commerce was intended.

The Fair Labor Standards Act is clearly distinguishable from the Anti-Trust Statutes, Section 1, Title 15, U.S.C.A., et seq., which deals with restraint of trade. "Trade" is a broader term than "interstate commerce". Trade may be restrained at the beginning, along the line, or at the end of interstate commerce. If trade is not permitted, commerce will dry up.

In the United States Cotton Standards Act, Title 7, Sections 51–65, U.S.C.A., the Act is made applicable, in Section 52, to any transaction or shipment in commerce or in any publication of a price or quotation determined in or in connection with any transaction or shipment in commerce, or, "in any classification for the purposes of or *in connection with a* transaction or shipment in commerce". It is submitted that the language above is exceedingly broad and relates to any classification for the purpose of or in connection with a transaction or shipment in commerce. There is no such broad language in the Fair Labor Standards Act except in relation to production, sales in interstate commerce, or sales, etc., intended for interstate commerce.

In the United States Warehouse Act, Title 7, Sections 241–273, U.S.C.A., the Act is made applicable to warehouses "in which any agricultural product is or may be stored for interstate or foreign commerce, or, if located within any place under the exclusive jurisdiction of the United States, in which any agricultural product is or may be stored." Section 242. The language of the statute is broad enough to cover the regulation of a local practice that adversely affects interstate commerce.

In The Tobacco Inspection Act, Sections 511 et seq., Title 7, U.S.C.A., it is provided that: "For the purposes of this chapter (but not in any wise limiting the foregoing definition) a transaction in respect to tobacco shall be considered to be in commerce if such tobacco is part of that current of commerce usual in the tobacco industry whereby tobacco or products manufactured therefrom are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture. * * *" Section 511(i).

It will be observed that Congress expressly exercised its full power in the regulation of local activities which would injuriously affect interstate commerce. The Congress, in Section 511a of said Chapter, further expressly finds that the lack of uniform standards of classification and inspection of tobacco brings about a fluctuation in prices, etc., which constitutes a burden on interstate commerce.

The National Labor Relations Act, Section 151 et seq., Title 29, U.S.C.A., is expressly made applicable to practices "materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce",

(section 151), and is not restricted to those engaged in commerce.

 It would seem, therefore, that decisions on the Anti-Trust Statute, the Cotton Control Act, Tobacco Control Act, Warehouse Act, and National Labor Relations Act, furnish little guide to the Court in the consideration of the question of whether a wholesaler, who is not producing goods for commerce, who is not selling goods in interstate commerce, and who is not selling goods with knowledge that shipment in interstate commerce is intended, and who is not operating under an Act of Congress regulating practices that affect interstate commerce, is, or is not, engaged in interstate commerce. The Court definitely concludes that the Fair Labor Standards Act does not attempt to regulate local transactions which merely *affect* interstate commerce except in the matter of production of goods for commerce or the sale of goods to be shipped, sold, and delivered in commerce, or intended to be shipped, sold, or delivered in interstate commerce.[1]

 The minimum wages and maximum hours provision of the Fair Labor Standards Act relates to *employees* who are engaged in interstate commerce or in the production of goods for commerce, but it is difficult to see how an employee could be engaged in commerce or in the production of goods for commerce unless his employer were likewise engaged, because the employee is merely the agent of the employer. It would be necessary, therefore, to determine whether or not the employer was engaged in interstate commerce as distinguished from a practice or business adversely affecting interstate commerce.

The question here presented therefore is, whether or not a wholesaler who purchases goods from outside the State of Florida, which goods are delivered in interstate commerce to the wholesaler by interstate transportation agencies, and which wholesaler takes the goods so shipped from the interstate carrier and places same in his store or warehouse and later sells all of said commodities locally, is engaged in interstate commerce.

We do not have a question of a wholesaler who acquires goods through interstate commerce and who resells same in interstate commerce, or who ships any part of his goods beyond the borders of his state, but we have a case where the goods have come to rest in the warehouse or store of a wholesaler without any proof that the wholesaler has ever shipped or sold any of said goods in interstate commerce or with knowledge that shipment, sale, or delivery in interstate commerce was intended.

 There exists some confusion as to what is meant by "interstate commerce". The distinction between "interstate commerce" and transactions or practices *"affecting* interstate commerce" has not always been kept clearly in mind. It is not believed that the term "interstate commerce", as long heretofore understood, has undergone any substantial changes in definition. The decisions of the Courts relating to the *power* of Congress to regulate interstate commerce and matters affecting interstate commerce have undergone considerable clarification, and an enlargement of prior conceptions. However, I am unaware of any imperative authority that

[1] See Footnote No. 5, page 206, opinion in Jewel Tea Company v. Williams, 10 Cir., 118 F.2d 202, 206, decided March 6, 1941, as follows:
"Senate Bill 2475, as introduced and as it passed the Senate, was limited to employees engaged in interstate commerce or in the production of goods for interstate commerce. The House, by amendment, broadened the coverage of the bill by requiring time and a half for overtime for all employees of an 'employer engaged in commerce in an industry affecting commerce.' 75th Cong., 3rd Sess., H.Rep. 2182.
"The conference draft of the bill, which was finally enacted into law after the Senate had refused to accede to the House amendment, restored the test of coverage contained in the original Senate bill, by applying the act to 'employees * * * engaged in commerce or in the production of goods for commerce.' Senator Pepper of Florida, a member of the Conference Committee which drafted the act as adopted, made its limited scope very clear in discussing the terms of § 7 before the Senate. In answer to an objection to the broad scope of the act, he said:
" 'I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. It is applicable only to those employees who themselves are engaged either in interstate commerce, or the production of goods for interstate commerce, and the contrary theory was definitely rejected by the Committee.' 83 C.R. 9168 (Senate— 75th Cong., 3rd Sess., June 14, 1938)."

has materially changed the long established concept that when goods shipped in interstate commerce have come to rest at the point of destination the interstate character of said commodities has ceased and the same becomes commingled with the mass of property within the state and subject to the regulatory powers of the State to the exclusion of regulation by the Federal Government. The enlargement of this concept is only that when Congress has found that practices in connection with the handling, processing, manufacture, or sale of such goods injuriously *affect* interstate commerce the practice may be regulated by the Congress. In the present case, all of the goods received by the defendant (the wholesaler) were placed in its store or warehouse, with the exception that in rare instances goods were shipped from out of the State to the wholesaler, which goods bore the name or brand of a particular customer, and in such instances these goods were delivered by the wholesaler to the purchaser in the original package. Such occurrences were only occasional, incidental, and exceptional, and were so small a part of the business of the wholesaler that the doctrine of de minimus would apply, even if the unbroken-package doctrine has not been thrown into the discard. As the Court remembers the testimony in this case, the food products handled by the wholesaler came in large boxes or packages that were opened in the storeroom, from which lesser quantities than the total shipment were sold to restaurants, cafes, hotels, markets, and the like, and that it was an exceptional instance that the packages in which the goods were shipped were unbroken. There may have been instances in which a tub of butter would be sold, but the proof does not show that only one tub of butter was received in the shipment or shipping package. The "original package" is defined in 15 C.J.S., Commerce, § 28, p. 310 as follows: "Where bottles or packages are fastened together and marked, or are placed in a larger box, barrel, crate, or other receptacle, and shipped therein, the outside box, bundle, or receptacle, and not any bottle or package contained therein, constitutes the original package, and this is true, although each bottle or package is separately wrapped in paper labeled 'original package' and marked with the name of the importer, and although the larger receptacle is furnished by the carrier." The source of the above statement is found in decisions of the Supreme Court of the United States.

The wholesaler in the instant case received eggs from outside the State of Florida, but when they were received they were brought into the storeroom and there the eggs were candled, graded, and assorted by taking each egg from the original crate, examining the same before a light, and placing eggs according to grade, quality, and condition in other crates or boxes. There is no proof that any eggs were sold in the original package. Cheese was received in large wheels, weighing as much as two hundred pounds. Poultry was received in large boxes of many dozen to the box. Salami, liverwurst, and other products were likewise received in large barrels, tubs, or containers, and parceled out by the wholesaler among the retail trade. However, it seems that the Supreme Court has discarded the unbroken-package doctrine by its holding in the case of Whitfield v. Ohio, 297 U.S. 431, 56 S.Ct. 532, 535, 80 L.Ed. 778, wherein it was said: "Even without such action by Congress the unbroken-package doctrine, as applied to interstate commerce, has come to be regarded, generally at least, as more artificial than sound. Indeed, in its relation to that commerce, it was definitely rejected in Sonneborn Brothers v. Cureton, 262 U.S. 506, 508, 509, 43 S.Ct. 643, 644, 67 L.Ed. 1095, as affording no immunity from state taxation. 'The interstate transportation,' this court there concluded, 'was at an end, and, whether in the original packages or not, a state tax upon the oil as property or upon its sale in the state, if the state law levied the same tax on all other oil or on sales of it, without regard to origin, would be neither a regulation nor a burden of the interstate commerce of which this oil had been the subject.'"

Of course, the above rule in reference to unbroken-package doctrine might not be true if the unbroken package remained the property of the interstate shipper, as in the case of automobiles or other commodities shipped on consignment, or to a branch of the interstate shipper, but in the present case title and possession of the goods in question vested in the wholesaler upon delivery by the carrier and became intermingled with the mass of property subject to the State's control. It would appear, therefore, that the unbroken-package doctrine has been discarded, but even if it had not been, the amount of the sale of an un-

broken package by the wholesaler was so small that the doctrine of de minimus would apply to such occasional shipments.

Having reached the above conclusion with reference to unbroken packages, we will next consider the question of the general nature of the business done, and of the commodities handled, by the defendant, and whether or not the defendant, and its employees, under the circumstances, were engaged in interstate commerce as distinguished from a business *affecting* interstate commerce.

The Court is led to the conclusion that when goods come to rest at the end of their interstate journey and are delivered to the purchaser, the interstate character of said goods has ceased and such goods are no longer in interstate commerce. Practices might be used in connection with the handling, processing, or manufacture of such goods which would injuriously affect interstate commerce, but such goods are no longer in interstate commerce. The case of Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, reaffirms the coming-to-rest doctrine that has so long been a part of the jurisprudence of this country. It will be recalled that chickens were shipped in interstate commerce to commission men in the State of New York. The commission men then sold to the slaughterhouse operators, including the Schechter Corporation, who then prepared the chickens for market and sold same to markets, usually within twenty-four hours of the time of purchase. The Court in that case said (295 U.S. text 542, 55 S.Ct. text 848, 77 L.Ed. 1570, 97 A.L.R. 947):

"Were these transactions '*in*' interstate commerce? Much is made of the fact that almost all the poultry coming to New York is sent there from other states. But the code provisions, as here applied, do not concern the transportation of the poultry from other states to New York, or the transactions of the commission men or others to whom it is consigned, or the sales made by such consignees to defendants. When defendants had made their purchases, whether at the West Washington Market in New York City or at the railroad terminals serving the City, or elsewhere, the poultry was trucked to their slaughterhouses in Brooklyn for local disposition. The interstate transactions in relation to that poultry then ended. Defendants held the poultry at their slaughterhouse markets for slaughter and local sale to retail dealers and butchers who in turn sold directly to consumers. Neither the slaughtering nor the sales by defendants were transactions in interstate commerce. Brown v. Houston, 114 U.S. 622, 632, 633, 5 S.Ct. 1091, 29 L. Ed. 257; Public Utilities Comm. v. Landon, 249 U.S. 236, 245, 39 S.Ct. 268, 63 L.Ed. 577; Industrial Association v. United States, 268 U.S. 64, 78, 79, 45 S.Ct. 403, 69 L.Ed. 849; Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 267, 48 S. Ct. 107, 72 L.Ed. 270.

"The undisputed facts thus afford no warrant for the argument that the poultry handled by defendants at their slaughterhouse markets was in a 'current' or 'flow' of interstate commerce, and was thus subject to congressional regulation. The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce had ceased. The poultry had come to a permanent rest within the state. It was not held, used, or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states. Hence decisions which deal with a stream of interstate commerce—where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here. See Swift & Co. v. United States, 196 U.S. 375, 387, 388, 25 S.Ct. 276, 49 L.Ed. 518; Lemke v. Farmers' Grain Co., 258 U.S. 50, 55, 42 S. Ct. 244, 66 L.Ed. 458; Stafford v. Wallace, 258 U.S. 495, 519, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 35, 43 S.Ct. 470, 67 L.Ed. 839; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 439, 50 S. Ct. 220, 74 L.Ed. 524."

It will be noted also that the above case dealt with an Act relating to "any transaction in or affecting interstate or foreign commerce". 48 Stat. 196, § 3(b). In the present case we are not dealing with an Act relating to matters that affect interstate commerce except in the production of goods for commerce. In McGoldrick v.

Berwind-White Co., 309 U.S. 33, 60 S.Ct. 388, 393, 84 L.Ed. 565, 12'3 A.L.R. 876, the Court again recognized that the interstate character of goods ceased "after the interstate journey has ended". The above phrase is used in the opinion numerous times and definitely reaffirms the coming-to-rest doctrine at the end of the journey in interstate commerce. The case of Atlantic Coast Line Railroad Company v. Standard Oil Company of Kentucky, 275 U.S. 257, 48 S.Ct. 107, 110, 72 L.Ed. 270, dealt with the shipment of oil and gasoline to Tampa, Florida, in which we find the following language:

"It seems very clear to us on a broad view of the facts that the interstate or foreign commerce in all this oil ends upon its delivery to the plaintiff into the storage tanks or the storage tank cars at the seaboard, and that from there its distribution to storage tanks, tank cars, bulk stations, and drive-in stations, or directly by tank wagons to customers, is all intrastate commerce. This distribution is the whole business of the plaintiff in Florida. There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff. There is no designation of any particular oil for any particular place within Florida beyond the storage receptacles or storage tank cars into which the oil is first delivered by the ships. The title to the oil in bulk passes to the plaintiff as it is thus delivered. When the oil reaches these storage places along the Florida seaboard, it is within the control and ownership of the plaintiff for use for its particular purposes in Florida. The plaintiff is free to distribute the oil according to the demands of its business, and it arranges its storage capacity to meet the future variation in its business needs at Tampa, Port Tampa, or. Jacksonville, or St. Johns river terminal.

"The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character, even though it be in the same cars. Chicago, M. & St. P. Ry. Co. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988. The change from rail to ship has often been held consistent with a continuity of interstate or foreign commerce, even though there may be only local billing. Texas & New Orleans R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Railroad Commission of Louisiana v. Texas & Pacific Ry. Co., 229 U.S. 336, 33 S.Ct. 837, 57 L.Ed. 1215; Baer Bros. Mercantile Co. v. Denver & Rio Grande Railroad Co., 233 U.S. 479, 34 S.Ct. 641, 58 L.Ed. 1055. On the other hand, in Chicago, M. & St. P. Ry. Co. v. Iowa, supra, the reshipment of an interstate shipment of coal after its arrival in the state in the same carload lots was held not inconsistent with the change from interstate to intrastate commerce."

See also the case of American Steel & Wire Company v. Speed, 192 U.S. 500, 24 S.Ct. 365, 48 L.Ed. 538, which case was approved in the recent case of McGoldrick v. Berwind-White Co., 309 U.S. 33, text 39, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876. In the American Steel & Wire Company case, supra [192 U.S. 500, 24 S.Ct. 370, 48 L.Ed. 538], the Court said: "With these facts in hand we are of opinion that the court below was right in deciding that the goods were not in transit, but, on the contrary, had reached their destination .at Memphis, and were there held in store at the risk of the steel company, to be sold and delivered as contracts for that purpose were completely consummated. * * *"

The decision in the Schechter case is directly in point. It is the last relevant pronouncement of the Supreme Court on the subject. In fact, it is in harmony with numerous decisions of the Court. This Court considers itself bound by the pronouncement of the Court above quoted from that case.

▊ The point was sought to be made by the plaintiffs that the defendant delivered foodstuffs to vessels of the Coast Guard and United States Navy at the docks in Miami, but no showing is made as to the quantity of goods so delivered, and from all the Court knows the quantity of goods delivered may have been consumed by the members of the crew at the docks in Miami the same day it was delivered. There is no showing that the vessels were immediately sailing to foreign waters or that they were sailing at all. There is no showing that the defendant made such sale with knowledge that any shipment or de-

livery in interstate commerce was intended. Sale and delivery was made at the docks in Miami and apparently were merely for the subsistence of the crew. As was said in the case of Superior Oil Company v. Mississippi, 280 U.S. 390, text 395, 50 S. Ct. 169, text 170, 74 L.Ed. 504: "A distinction has been taken between sales made with a view to a certain result and those made simply with indifferent knowledge that the buyer contemplates that result. Louisville & Nashville Railroad Company v. Parker, 242 U.S. 13, 14, 37 S.Ct. 4, 61 L.Ed. 119; Kalem Co. v. Harper Brothers, 222 U.S. 55, 62, 32 S.Ct. 20, 56 L.Ed. 92, Ann.Cas.1913A, 1285."

The testimony wholly fails to show any connection between the sales of foodstuffs to the vessels at the docks in Miami and interstate or foreign commerce.

There is no question in the writer's mind that a wholesaler selling goods in interstate commerce, or who produces goods for commerce, or who sells goods with the knowledge that sale and delivery in interstate commerce is intended, is within the provisions of the Fair Labor Standards Act, but the facts here show that the defendant was not engaged in any of these enterprises.

■■■ It is argued that the employees of the defendant, when hauling the goods from the boat or the railroad freight depot, and when unloading commodities from the interstate trucks into the store, were engaged in interstate commerce. The Court cannot approve this contention. When the interstate carrier delivered the goods to the defendant the interstate commerce ceased. Any movement thereafter of said goods was purely intrastate. A delivery of the goods to the employee of the defendant was, of course, a delivery to the defendant. The interstate transportation had ended. The fact that there was a quick turnover or sale of the goods by the wholesaler could be attributed to the salesmanship of the wholesaler, the quality of its products, the character of its dealings, the demands of the season, as well as the activity and business of its customers. There is no question that the commodities were purchased by, and belonged to, the wholesaler. If he failed to sell same, it was his misfortune. They had come to rest but not to rot. He could not return them in interstate commerce to the source from which they came. The rapidity of sale or the length of time held cannot be deter-

minative of the question of interstate commerce but are dependent largely upon local conditions such as the manner of conducting the business of the wholesaler, the manner of conducting the business of its customers, or other entirely local conditions. The situation of the defendant here is entirely dissimilar to that of a jobber or broker who makes purchases in interstate commerce for direct customers and in whose hands neither the title nor the possession of the goods ever comes to rest. It is distinguishable from instances in which an out-of-state shipper ships to himself or one of his branches. The case is likewise distinguishable from goods shipped on consignment in which title is reserved in the interstate seller.

■■■ The Court is of the opinion that the Certified Brokerage & Transport Corporation was engaged in interstate commerce. The evidence shows that this corporation, organized in March, 1938, was engaged in the business of hauling eggs from the State of Georgia and other commodities from Jacksonville, in the State of Florida, for delivery to the Certified Poultry & Egg Co., Inc., by truck under such conditions as made the Certified Brokerage & Transport Corporation a private carrier in interstate commerce. The proof shows that only two of the employees, to wit, Ellis H. Roberts and one Willbanks, were employed by the Brokerage Corporation. It further appears that the said Roberts was required to work hours far in excess of the maximum hours permitted by the Fair Labor Standards Act, but the Court is of the opinion that these employees are within the exemption provided in Section 213(b) Title 29 U.S. C.A., wherein it is provided: "(b) The provisions of section 207 shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49."

Unquestionably the Certified Brokerage & Transport Corporation was a private carrier. It was a contract carrier in interstate commerce and the Interstate Commerce Commission, under said Section 304 of Title 49, U.S.C.A., had the *power* to fix the maximum hours of service. The exemption in the Fair Labor Standards Act is not conditioned upon the exercise of the power by the Interstate Commerce

Commission, but merely exempts those whose hours the Interstate Commerce Commission has the power to regulate, and the Court, therefore, holds that although the employees of the Transport Corporation were engaged in interstate commerce, nevertheless, they are within the aforesaid exemption in the Fair Labor Standards Act.

Counsel for the plaintiffs have argued at length that the Certified Brokerage & Transport Corporation was a subsidiary of the Certified Poultry & Egg Co., Inc., and that, therefore, the drivers of the truck of the Transport Corporation were in fact employees of the Poultry & Egg Co. It is observed that the Certified Brokerage & Transport Corporation was organized in March, 1938, which was before the passage of the Wages and Hours Law on June 25, 1938. There is no proof that it was organized for the purpose of evading the provisions of the Wages and Hours Law. It has only one stockholder in common with the Poultry & Egg Company. The Court is aware of no law that is violated in the formation of the Transport Corporation for the purpose of conducting the hazardous business of running trucks on the highway. The operation of a separate transportation company is not unlawful, and even if designed for the purpose of keeping the parent company from engaging in interstate commerce, the Court cannot say it was an unlawful act. The evidence in the case does not sustain the contention of counsel for the plaintiffs that this was the purpose of the organization of the Transport Corporation, which occurred before the Fair Labor Standards Act was passed and many months before the effective date thereof.

The Court has given consideration to the argument advanced that Section 213(a) (2) expressly exempts an employee "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." It is argued that Congress, by expressly exempting employees of retail establishments, meant to include the employees of wholesalers. I entertain the view that Congress sought to eliminate the question of whether a retailer who made occasional *sales in interstate commerce* would be under the Act; otherwise a retailer would be under the Act if he made sales in interstate commerce. As the law stands, if the greater part of a retailer's business is in interstate sales, such a retailer would be under the Act. The criterion is not whether the merchant is a wholesaler or a retailer, but whether or not he is *making sales in interstate commerce*. We know, as a matter of common knowledge, that the vast majority of retailers receive goods in interstate commerce in the same manner as does the wholesaler, and if the reception of goods in interstate commerce alone, unaccompanied by interstate sales, puts a wholesaler in interstate commerce, it likewise would put the retailer in interstate commerce. Even under the law with the exemption provided in Section 213(a) (2) a retailer would be under the Act if the greater part of his sales was interstate commerce.

So it is plainly apparent from the Act itself that Congress intended, as to merchants, that the criterion would be the making of *sales in interstate commerce or for interstate commerce* rather than the receipt of goods shipped to the merchant by interstate transportation. It seems inescapable to me, therefore, that before a merchant, who is neither engaged in the production of goods or in the sale of goods with the knowledge that shipment or sale of same in interstate commerce is intended, can be held to be within the provisions of the Fair Labor Standards Act, it is essential to show that such a merchant, if a wholesaler, has sold goods in interstate commerce, or, if a retailer, it is essential to show that the greater part of his sales is in interstate commerce.

The applicability, or coverage, of the Fair Labor Standards Act, except in the field of production of goods for commerce, or the sale of goods in, or for, commerce, has been shrouded in great uncertainty. It has been most difficult for employer and employee, the Bench and the Bar, to determine, in many instances, its coverage. It is a penal statute, carrying with it severe penalties in event of the conviction for a willful violation. In addition, it carries with it, in the form of liquidated damages and attorney's fee, an exaction in the nature of a civil penalty, recoverable by employees in a case where it is probably not necessary to show that the failure to comply with the provisions of the law was either intentional or willful. Because of the width of the coverage of the Act, the penalties that flow from its unobservance, and the fact that it requires obedience from so many people unlearned in the law, it is highly important for the Courts to try

to discern whether there is not some well-defined and commonly understood course of business custom or dealing applicable to the Act and its coverage, and, if consistent with the wording and intent of the Act, to construe the Act in the light of such commonly understood custom, so that "he who runs may read". It is believed that Congress intended to deal with employer and employee in the light of common, every day intelligence and experience, and intended that those coming under the provisions of the Act could know if and when they were under the Act; and the Bar might likewise be able, in confidence, to advise their clients as to whether or not they were within the Act, whose benefactions have been somewhat obscured in its perplexities. It is not believed that Congress, knowing that the Act affected laymen and those unlearned in the law, designed to make the applicability of the law so enveloped in mystery, technical considerations, and fine-spun theories relating to interstate commerce, that the people affected must grope in darkness and uncertainty as to whether the Act is applicable, and whether or not the heavy penalties of the law are hanging heavily over their heads.

 It is perfectly clear that those who are engaged in the manufacture of goods for commerce, or intended for commerce, are covered by the Act. It seems clear that the exemption in Section 213(a) (2) of an employee engaged in any retail or service establishment, "the greater part of whose selling or servicing is in intrastate commerce", clearly showed the intent of Congress to make the Act applicable only to those engaged in a selling enterprise who *sell* goods or service in interstate commerce. Such a construction of the Act will enable all persons engaged in selling to know whether or not they are covered by the Act, because the making of sales in interstate commerce is a well-known and definitely understood course of business dealing. We understand the term. This construction is consonant with the phraseology of the Act. It is sound and reasonable in that it furnishes an easily understood criterion by which those engaged in selling may know they are affected by the Act. I, therefore, regard the term "engaged in commerce" in the light of its common understanding as distinguished from any wide or technical aberrations from the customary concept of the term.

Believing, therefore, that Congress intended, and inferentially said in exempting retailers who make only a small portion of their sales in interstate commerce, that the Act should be applicable only to those merchants selling in interstate commerce, and that any other construction will continue to result in continuous confusion with such heavy penalties upon innocent people who would otherwise be unable to know whether they were under the Act or not, I am impelled to the conclusion that those engaged in the selling business are not under the Act, and should not by judicial construction be placed under the Act, unless they make sales in interstate commerce. In short, it is the business that the merchant is himself engaged in, and not the incidents and events that have transpired before the goods are received by him and over which he had no direct control, that should determine the character of the business in which the merchant is engaged.

To hold that goods which have reached the end of their interstate journey and have been delivered to the purchaser at the end of said journey are still in interstate commerce would seem to render such goods immune from State and local taxation. It seems inescapable that if such goods, after the conclusion of interstate transportation, are interstate commerce for one purpose they must be interstate commerce for all purposes. It is not believed that Congress intended by the Fair Labor Standards Act to disturb and disrupt the taxing structure of States and local taxing units. Substantial local revenues are obtained from excise taxes, sales taxes, and ad valorem taxes on inventories, of the goods in the warehouses of wholesalers. The above statement is dictum in this case, but it is made for the purpose of showing another very cogent, practical reason why the Act was intended to be applicable only, so far as the merchant is concerned, to sales made in interstate commerce as distinguished from purely local sales.

This Court is of the view that isolated transactions, not a part of the usual course of business, as in an instance where a wholesaler makes a special order from a factory in another State and directs that the goods be shipped directly to his customer, do not bring such wholesaler within the provisions of the Act, and this would be true even though the Act undertook to regulate such transactions as being a prac-

tice that injuriously affected interstate commerce or the free flow of goods in commerce. It is readily understandable that if the merchant were limited in serving his customers in procuring for them goods not usually kept in stock, such a limitation would retard the interstate commerce and slow down the wheels of commerce and obstruct the free flow of goods in interstate commerce. This latter conclusion might not be true if such orders and shipments constituted the major portion of the merchant's business. It is frequently necessary to obtain a piece of machinery quickly and directly from the factory, in areas away from the metropolitan district, in order that a plant may resume operation and employees return to work. So it is believed that the test should be the general course of business, rather than isolated transactions, in applying the Act to those engaged solely in the selling industry even though sales in interstate commerce should not be the true test of the coverage of the Act as applied to merchants.

In fine, I conclude that the evidence fails to show that the Certified Poultry & Egg Co., Inc., was: (a) Engaged in interstate commerce; (b) engaged in the production of goods for commerce; or (c) selling goods with knowledge that sale or delivery in interstate commerce was intended; and that since the Act does not attempt to regulate intrastate sales which might affect interstate commerce, the Certified Poultry & Egg Co., Inc., is not within the provisions of the Act and as to it the complaint should be dismissed.

I further find that the Certified Brokerage & Transport Corporation is engaged in interstate commerce but is exempt from the maximum hour provisions of Section 207. The exemption from the maximum hour requirement would not seem to exempt the Certified Brokerage & Transport Corporation from paying to its employees the straight minimum hourly wage provided by Section 206 but not at the rate of time and a half for overtime under the provisions of Section 207.

The Court remembers the testimony as to the hours worked by Ellis H. Roberts as being most indefinite and as being largely based upon guesswork and estimates; that no records of the time were kept by Roberts or the Transport Corporation. The testimony on the subject has not been transcribed and is not before the Court. As the Court remembers the

testimony, it is extremely doubtful as to whether evidence measures up to the degree of certainty that is required in order for the Court to determine the number of hours actually worked by said employee, and the amount of any additional straight compensation that he might be entitled to receive. It will, therefore, be necessary for counsel for the parties to submit an agreed gist of the testimony relative to this question or to have transcribed for the use of the Court the testimony relating to the number of hours worked by the said Roberts for the said Transport Corporation. The decision of the Court as to the liability of the Certified Brokerage and Transport Corporation for additional wages to the said Ellis H. Roberts under Section 206 is reserved with the right in counsel to comply with the above suggestions within a period of fifteen days from this date.

An appropriate order may be prepared and submitted after the disposition by the Court of the liability of the Certified Brokerage & Transport Corporation to the plaintiff, Ellis H. Roberts.