**FLEMING, Administrator of Wage and Hour Division, v. GOLDBLATT BROS., Inc.**

**No. 1582.**

District Court, N. D. Illinois.

June 19, 1941.

Gerard D. Reilly, Sol., and Irving J. Levy, Asst. Sol. in Charge of Litigation, both of Washington, D. C., and Alex Elson, Regional Atty., Frank J. Delany, Atty., both of Chicago, Ill., for plaintiff.

Pritzker & Pritzker and Taylor, Miller, Busch & Boyden, all of Chicago, Ill. (Abram N. Pritzker, Preston Boyden, Stanford Clinton, Morris I. Leibman, and Robert Marks, all of Chicago, Ill., of counsel), for defendant.

SULLIVAN, District Judge.

This is a suit brought by the Administrator of the Wage and Hour Division of the United States Department of Labor, wherein it is sought to enjoin and restrain Goldblatt Bros., Inc., the defendant herein, from violating Sections 15(a) (1) and 15 (a) (2) of the Fair Labor Standards Act of 1938. Title 29 U.S.C.A. § 201 et seq.

Following various allegations concerning interstate commerce and the production of

goods for interstate commerce, the complaint charges defendant with non-compliance with the Act in respect to employees of the defendant working at three of its warehouses located respectively at 3932 South Wolcott Avenue, 38th and Loomis Streets, and 1927 West Pershing Road, in Chicago, Illinois.

Defendant's amended answer denies that any of the employees in the three warehouses specified in the complaint were engaged in either interstate commerce or the production of goods for interstate commerce, and also sets out that the warehouse located at 38th and Loomis Street is no longer being operated, but that in lieu thereof defendant is operating a warehouse at 3932 Wentworth Avenue, Chicago, Illinois. Various affirmative defenses, consisting for the most part of exemptions contained in the Act, are also set forth in the amended answer. At the trial plaintiff offered evidence to prove, first, that a substantial number of the employees at the warehouses in question were engaged in interstate commerce, and secondly, the failure of defendant to compensate such employees in accordance with the minimum wage and overtime provisions of the Act. At the close of plaintiff's case the court ruled that the burden of proof with respect to the affirmative defenses pleaded by defendant, including the applicability of the retail establishment exemption to the warehouses, was on the defendant; and that the only question before the court at the close of plaintiff's case was the extent to which plaintiff had proved or failed to prove its prima facie case. The question, therefore, for the court now to decide is whether plaintiff has shown that defendant's employees were engaged in such commerce, or in the production of goods for commerce, as will bring them under the provisions of the Fair Labor Standards Act of 1938.

Section 15(a) (1) of the Act prohibits shipment in interstate commerce of goods produced for interstate commerce by employees whose wages and hours of employment do not conform to the requirements of the Act; or selling such goods with knowledge that shipment or delivery or sale thereof in commerce is intended.

Section 15(a) (2) prohibits the violation of any of the provisions of Sections 6 or 7, or any regulation or order of the Administrator.

Section 6 provides the minimum wages which every employer shall pay to employees who are engaged in commerce or the production of goods for commerce.

Section 7 provides the maximum hours which an employer shall require such employees to work, and the payment of time and one-half for overtime to all employees engaged in commerce or the production of goods for commerce. Section 2 sets out the findings and declaration of policy as follows:

"(a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is hereby declared to be the policy of this Act [chapter], through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

Section 3 defines, among others, the following terms:

"(b) 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof.

\* \* \* \* \* \*

"(h) 'Industry' means a trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed.

"(i) 'Goods' means goods \* \* \* wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof \* \* \*.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other

manner worked on in any State; and for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

The constitutionality of the Fair Labor Standards Act is not here involved, that having been established in the case of United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. ——, 132 A.L.R. 1430.

Defendant operates places of business other than the places complained of, but in the three warehouses here in question it engages in two types of operations: (a) merchandising operations consisting of the receipt, storage, and distribution of merchandise, which is neither changed in form nor processed; and (b) manufacturing operations, consisting of the receipt and processing of goods, and the distribution of the finished product; and all of the warehouse employees perform work necessary to either or both of these operations.

Both sides agree that the Fair Labor Standards Act is predicated entirely and solely upon the nature of the employee's work, with complete emphasis placed on the type and nature of the work of the employee rather than upon the activities of the employer. Application of the Act is determined by the activities of each individual employee, not by the activities of the employer, and only those "employees * * * engaged in commerce or in the production of goods for commerce" come within the terms of the Fair Labor Standards Act. However, it is difficult to see how an employee can be engaged in interstate commerce, or in producing for interstate commerce, unless his employer is also so engaged.

The purpose of the Act is to eradicate from interstate commerce the evils attendant upon low wages and long hours of service in industry. The elimination of substandard labor conditions are sought only in "industries engaged in commerce or in the production of goods for commerce" and the findings contained in the Act are confined to "industries engaged in commerce or in the production of goods for commerce." This of course does not and

could not mean commodities or goods which are purchased in commerce, and the Act nowhere covers conditions affecting commerce, which term is defined in the National Labor Relations Act, § 2(7), 29 U.S.C.A. § 152(7), as meaning "in commerce, or burdening or obstructing commerce or the free flow of commerce." It is necessary, therefore, to keep in mind the difference between "interstate commerce" and transactions or conditions "affecting interstate commerce." In the case of Gerdert et al. v. Certified Poultry & Egg Co., Inc., et al., 38 F.Supp. 964, 969, decided by the United States District Court for the Southern District of Florida, on April 29, 1941, the court said: "It is not believed that the term 'interstate commerce', as long heretofore understood, has undergone any substantial changes in definition. The decisions of the Courts relating to the power of Congress to regulate interstate commerce and matters affecting interstate commerce have undergone considerable clarification, and an enlargement of prior conceptions. However, I am unaware of any imperative authority that has materially changed the long established concept that when goods shipped in interstate commerce have come to rest at the point of destination the interstate character of said commodities has ceased and the same becomes commingled with the mass of property within the state and subject to the regulatory powers of the State to the exclusion of regulation by the Federal Government. The enlargement of this concept is only that when Congress has found that practices in connection with the handling, processing, manufacture, or sale of such goods injuriously affect interstate commerce the practice may be regulated by the Congress."

In Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947, the defendants there operated a wholesale slaughter house market, and dealt in poultry which was shipped in from outside the state, either directly or through consignees. In that case it was held that the local slaughtering and selling activities did not constitute interstate commerce, the court saying:

"The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local

disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce has ceased. * * *

"The question of chief importance relates to the provisions of the code as to the hours and wages of those employed in defendants' slaughterhouse markets. It is plain that these requirements are imposed in order to govern the details of defendants' management of their local business. The persons employed in slaughtering and selling in local trade are not employed in interstate commerce. Their hours and wages have no direct relation to interstate commerce. The question of how many hours these employees should work and what they should be paid differs in no essential respect from similar questions in other local businesses which handle commodities brought into a state and there dealt in as a part of its internal commerce. * * *

"Similar conditions may be adduced in relation to other businesses. The argument of the government proves too much. If the federal government may determine the wages and hours of employees in the internal commerce of a state, because of their relation to cost and prices and their indirect effect upon interstate commerce, it would seem that a similar control might be exerted over other elements of cost, also affecting prices, such as the number of employees, rents, advertising, methods of doing business, etc. All the processes of production and distribution that enter into cost could likewise be controlled. If the cost of doing an intrastate business is in itself the permitted object of federal control, the extent of the regulation of cost would be a question of discretion and not of power. * * *

"We are of the opinion that the attempt through the provisions of the code to fix the hours and wages of employees of defendants in their intrastate business was not a valid exercise of federal power."

In the case at bar the warehouses in question are used by the defendant as centers for the receipt of goods in large quantities and the distribution of the same to their various retail stores. Through these warehouses pass goods of every kind and description from all corners of the United States. Forty-five of the forty-eight states send merchandise into the warehouses in a steady stream, from which warehouses it is distributed. Title to all this property in bulk passes to Goldblatt Brothers when it is delivered at the warehouses in Chicago, and it assumes title, ownership and control over the same for distribution to, and ultimate sale in their retail establishments. The commodities here in question having been purchased by Goldblatt Brothers, and having been delivered to them at their warehouses in Chicago, interstate relations thereto then ceased. The property or goods were no longer in a "stream or flow of commerce" but had come to rest in defendant's warehouses, and defendant was free to distribute the same to its retail stores according to the demands of its business. This distribution of its own goods to its own retail establishments does not constitute such a continuing current or flow of interstate commerce as would subject them to Congressional regulation. All of the activities carried on by defendant at its various warehouses are performed for the benefit of its ultimate retail customers; none of the commodities or goods there received, or there manufactured or processed, is intended for reshipment in interstate commerce. Distribution of them to defendant's retail stores does not continue them in a current or flow of interstate commerce such as is contemplated by the law when goods and commodities come only to temporary rest within a state, but are intended ultimately to further movement in interstate commerce, and regulations involved in that continuity of movement are not applicable here. The goods or commodities here in question were not held, sold or used by Goldblatt Brothers in relation to any further transactions in interstate commerce, save only in the technical sense that some of their retail stores are across the Indiana line, in close proximity to their Illinois stores and their central warehouses in the Chicago area.

While technically the transfer from defendant's warehouses in Illinois to its Indiana stores may be considered an activity in interstate commerce, the Supreme Court of the United States has pointed out that there is a difference between what is national and what is local in the matter of commerce. In the case of Labor Board v. Jones & Laughlin Corp., 301 U.S. 1, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, the court said: "The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the

several States' and the internal concerns of a state. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system."

Again, at page 37 of 301 U.S., at page 624 of 57 S.Ct., the court further said: "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. * * * Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."

Conversely, activities may be interstate in character when separately considered but have such a close and substantial relation to intrastate commerce that state control is essential and appropriate. Here we have no question of sale or shipment beyond the borders of the state. No shipment has been made in interstate commerce of goods or commodities produced for interstate commerce. The goods and commodities having been previously purchased by defendant, they belonged to it; no further sale of them has taken place; there has been no change of ownership or title. Defendant has not engaged in commerce, as that term is defined in the Act, save only as it has changed the location of its own goods by moving them from its own warehouses in Illinois, where they had been stored, to its own retail stores in Indiana, where they are ultimately to be sold. If defendant, instead of storing its goods in its central warehouses in Illinois, had seen fit to have them shipped direct to its Indiana stores, no question of interstate commerce would have arisen. Therefore, I do not believe that such a purely local transaction as transferring its goods from its Illinois warehouses to its Indiana retail stores is such an activity as is contemplated by the act when it refers to those "engaged in commerce" or "in the production of goods for commerce." The provisions of the Act prohibit the manufacture for and shipment in interstate commerce of goods

produced for commerce by employees employed at less than the prescribed minimum wage, or for more than the prescribed maximum hours without payment of the required overtime wage. United States v. Darby, supra; Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L. Ed. ——.

Whether or not such a technical interstate transportation by a local retail merchant as the one here involved is or is not included under the Fair Labor Standards Act or even the National Labor Relations Act, has not yet been passed upon by the Supreme Court, so far as I can find. See also Gerdert et al. v. Certified Poultry & Egg Co., Inc., et al., D.C.S.D.Fla., 38 F. Supp. 964, decided April 29, 1941. Collins et al. v. Kidd et al., D.C.E.D.Tex., 38 F.Supp. 634, decided May 1, 1941. National Labor Relations Board v. White Swan Co., 4 Cir., 118 F.2d 1002, Apr. 15, 1941.

The President of the United States, in his message to Congress proposing the Fair Labor Standards Act, among other things said: "As we move resolutely to extend the frontier of social progress, we must be guided by practical reason and not by bare formulae," and the instant case would seem to be one where reason and not bare formulae should prevail. The activities here involved constitute intrastate commerce in every sense, save only for the physical presence of the state line between Illinois and Indiana. While the region where the activities are carried on embraces portions of two states, nevertheless the activities themselves comprise a continuous and integrated business and economic unit, local in character, such as naturally grow up adjacent to a great metropolitan center such as Chicago; and to hold that such a local activity constitutes interstate commerce would destroy the distinction between what is national and what is local. I do not share plaintiff's fears that a practical common-sense interpretation in this entirely technical interstate activity will bring about a "legal no-man's land" over which no government will have jurisdiction. It will be soon enough to meet such an issue when and if it arises.

I am of the opinion that plaintiff has failed to prove that defendant's employees are engaged in commerce, or in the production of goods for commerce, as those terms are used in the Fair Labor Standards Act of 1938, and judgment is rendered accordingly.