**VEAZEY DRUG CO. v. FLEMING, Administrator, et al.**

No. 723.

District Court, W. D. Oklahoma.

Dec. 16, 1941.

Everest, McKenzie & Gibbens, of Oklahoma City, Okl., for plaintiff.

Hayson, Jennings & Fisher, of Oklahoma City, Okl., for individual defendants.

VAUGHT, District Judge.

In this action the plaintiff seeks a declaratory judgment defining the rights of certain of its employees under the Fair Labor Standards Act of 1938, 29 U.S.C.A. c. 8, §§ 201–219.

The purpose of this Act is to regulate wages and hours of employment by employees engaged in interstate commerce and under section 213 it specifically exempts "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The defendants, Philip Fleming, Administrator of the Wage and Hour Division, United States Department of Labor; G. C. Street, Jr., Regional Director under the Administrator of the Wage and Hour Division, United States Department of Labor; Robert H. Jackson, Attorney General of the United States; and Charles E. Dierker, United States District Attorney for the Western District of Oklahoma, have filed their motions to dismiss for want of jurisdiction and for other reasons. Said motions have been sustained and the only defendants remaining in the case are employees of the plaintiff, Veazey Drug Company.

The facts are stipulated. The plaintiff is an Oklahoma corporation operating a general retail drug business within the city of Oklahoma City, Oklahoma. It operates twenty retail stores situated in various sections of the city and for the convenience of its stores, maintains a warehouse centrally located, to which practically all of the merchandise shipped to said corporation, both from within and without the state, is delivered.

It is admitted that all shipments of merchandise to the plaintiff are delivered by the shipper, or the carrier under orders of the shipper, to the warehouse of the plaintiff, and that the remaining defendants are the persons employed in said warehouse.

In February, 1941, the plaintiff received a letter from the Regional Director stating that his office had received information indicating that the plaintiff's employees probably were subject to the Fair Labor Standards Act. On February 15, the plaintiff replied to this letter, stating that it did not consider that its employees, employed at the warehouse, were subject to the minimum wage or overtime provisions of the Wage and Hour Law. To this letter, the Regional Director replied on February 28, stating "since your statement indicates that you have not complied with the provisions of the Act with respect to such employees, to achieve compliance with the Act's provisions, it will be necessary that you pay each of your present and former employees the difference between the amounts already paid them and the amounts due under the Act."

Because of the different constructions placed upon the Wage and Hour Act by the Regional Director and the plaintiff, and the resulting dissatisfaction created among the employees of said plaintiff, and to have the Act construed with reference to its application to the plaintiff and its employees, this action was filed.

The attitude of the defendant employees is that, if this Act covers their employment, they desire to have their wages paid in accordance therewith; if it does not, that they are entitled to be so advised.

It is agreed that the plaintiff is not engaged in the transportation of merchandise in any manner other than from its warehouse to its various stores, all within the city. The trucks delivering merchandise to the plaintiff, either from the railroad station or from points without the state, deliver the merchandise to the dock of the plaintiff's warehouse, and no employee of the plaintiff company performs any service except to receive the merchandise at the

dock. In some instances, certain of the employees may have rendered very limited services in assisting in removing some of the heavy merchandise from the rear end of the truck onto the platform or dock of the plaintiff, but even this limited service is not performed by the said employees until the merchandise has been checked in by the checker, an employee of said· plaintiff, and actually *received* by said plaintiff. The defendants are employed by the plaintiff for the purpose of receiving said goods, checking them with the invoices, and after they are delivered onto the dock of the plaintiff's warehouse, transferring them into the warehouse and marking the retail price thereon, sometimes on the unbroken packages and sometimes after the merchandise has been taken from the original packages.

The real question in controversy is whether or not the assistance rendered by the employees of the plaintiff on the warehouse dock, in receiving the goods from the truck, constitutes interstate commerce within the provisions of the Fair Labor Standards Act.

Under ordinary circumstances it ought not to be necessary to define the distinction between "intrastate" and "interstate commerce," but evidently from the briefs filed in this case and the contention of counsel for the defendants at the hearing in this case, it is necessary to make clear this distinction, and in making this distinction, this court limits its definition of those terms to the definitions as given in the decisions of the federal courts.

The Act itself defines "commerce" as follows: " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." 29 U.S.C.A. § 203(b).

■■ Intrastate commerce is commerce wholly within a state. If the plaintiff, through its employees, is engaged in intrastate commerce only, then Congress would have no power to enact a measure which would seek to control hours and wages of its employees.

The sole power of Congress to regulate commerce of any character is found in Article I, Section 8 of the Constitution, as follows: "The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; * * *"

The first important case in which the Supreme Court of the United States construed this section of the Constitution is Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 211, 6 L. Ed. 23, and in that famous opinion the court, referring to the right to engage in commerce between the states, said: "In pursuing this inquiry at the bar, it has been said, that the constitution does not confer the right of intercourse between state and state. That right derives its source from those laws whose authority is acknowledged by civilized man throughout the world. This is true. The constitution found it an existing right, and gave to congress the power to regulate it."

Certainly under this construction of the Constitution, the power to engage in commerce and the right to engage in commerce were inherent. The sole power granted to Congress under this provision of the Constitution was to regulate the commerce between the states and with foreign nations. This same line of reasoning was approved in Brown v. Maryland, 12 Wheat. 419, 25 U.S. 419, 6 L.Ed. 678.

Prior to the adoption of the Constitution, the words "interstate and foreign commerce" were not recognized as words with legal significance.

■ The Constitution gave to Congress, and took from the states, the power to regulate interstate and foreign commerce and, therefore, the necessity for defining interstate and foreign commerce, as well as intrastate commerce, rests ultimately with the Supreme Court.

In Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 477, 29 L.Ed. 715, the Supreme Court again had occasion to pass upon this question. The case grew out of a shipment of logs which were cut in New Hampshire for final shipment to Maine. According to custom, they remained in or near the river for a year or more, apparently for the purpose of seasoning. They were taxed while in that condition by the state of New Hampshire and it was held that the tax was valid, as the property was not actually in interstate commerce. The test laid down was when did "they commence their final movement for transportation from the state of their origin to that of their destination," and the court said:

"There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to

us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination."

██ In Hammer v. Dagenhart, 247 U. S. 251, 272, 38 S.Ct. 529, 531, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, the court again addressed itself to this rule, and said:

"Commerce 'consists of intercourse and traffic * * * and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities.' The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. Delaware, Lackawanna & Western R. R. Co. v. Yurkonis, 238 U.S. 439, 35 S.Ct. 902, 59 L.Ed. 1397.

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

"'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene, C.C., 52 F.[104] 113. This principle has been rec-, ognized often in this court. Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Bacon v. Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L.Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the States. Kidd v. Pearson, 128 U.S. 1, 21, 9 S.Ct. 6, 32 L.Ed. 346.

In Chassaniol v. City of Greenwood, 291 U.S. 584, 586, 54 S.Ct. 541, 542, 78 L.Ed. 1004, decided March 12, 1934, Mr. Justice Brandeis, speaking for the court said:

"Chassaniol contends that all the cotton is in interstate or foreign commerce from the moment it leaves the gin for Greenwood, or at least from the moment it is purchased at Greenwood by the buyer. The argument is that already at that time the cotton is destined for ultimate shipment to some other state or country; and that to tax the occupation of the cotton buyer burdens interstate commerce, since the buyer at Greenwood is the instrumentality by which the interstate transaction is initiated. The business involved is substantially like that described in Federal Compress & Warehouse Co. v. McLean [291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622]; and the rule there declared must govern here. Ginning cotton, transporting it to Greenwood, and warehousing, buying and compressing it there, are each, like the growing of it, steps in preparation for the sale and shipment in interstate or foreign commerce. But each step prior to the sale and shipment is a transaction local to Mississippi, a transaction in intrastate commerce."

In Schechter Poultry Corp. v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947, the same court had occasion to reaffirm the doctrine which had been recognized since 1824. The court there said:

"The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. * * * Hence decisions which deal with a stream of interstate commerce—where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here.

\* \* \* \* \* \* \*

"In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle.

\* \* \* \* \* \*

"It is not the province of the Court to consider the economic advantages or disadvantages of such a centralized system. It is sufficient to say that the Federal Constitution does not provide for it. Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce

and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state. The same answer must be made to the contention that is based upon the serious economic situation which led to the passage of the Recovery Act, [48 Stat. 195],—the fall in prices, the decline in wages and employment, and the curtailment of the market for commodities. Stress is laid upon the great importance of maintaining wage distributions which would provide the necessary stimulus in starting 'the cumulative forces making for expanding commercial activity.' Without in any way disparaging this motive, it is enough to say that the recuperative efforts of the federal government must be made in a manner consistent with the authority granted by the Constitution."

■ In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, the Supreme Court approved the rule announced in the Schechter case, supra, and said:

"The authority of the federal government may not be *pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state*. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system. [Emphasis supplied.]

\* \* \* \* \*

"It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. In the Schechter Case, supra, we found that the effect there was so remote as to be beyond the federal power. To find 'immediacy or directness' there was to find it 'almost everywhere,' a result inconsistent with the maintenance of our federal system."

■ In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 466, 58 S.Ct. 656, 660, 82 L.Ed. 954, the court again said:

"It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several states. The expansion of enterprise has vastly increased the interests of interstate commerce but the constitutional differentiation still obtains. Schechter Poultry Corporation v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947. 'Activities local in their immediacy do not become interstate and national because of distant repercussions.' Id., 295 U.S. 495, at page 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570, 97 A.L.R. 947.

"To express this essential distinction, 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as 'interstate commerce,' 'due process,' 'equal protection.' In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion."

■ The Tenth Circuit Court of Appeals in Jewel Tea Co. v. Williams, 118 F. 2d 202, 207, in dealing with a civil action under the Fair Labor Standards Act of 1938, said:

"Where goods are ordered and shipped in interstate commerce to meet the anticipated demands of customers without a specific order therefor from the customer and the goods come to rest in a warehouse, the interstate commerce ceases when the goods come to rest in the state. It does not continue until the demand eventuates in the form of an order and the merchandise is delivered to the retailer.

"The mere fact that an anticipated local transaction causes a movement in interstate commerce is not sufficient to con-

stitute the local transaction a part of interstate commerce."

Many of the District Courts have passed upon this question. In Gerdert v. Certified Poultry & Egg Co., D.C., 38 F.Supp. 964, 970, Judge Waller, of the Southern District of Florida, said: "* * * when goods shipped in interstate commerce have come to rest at the point of destination the interstate character of said commodities has ceased and the same becomes commingled with the mass of property within the state and subject to the regulatory powers of the State to the exclusion of regulation by the Federal Government."

It will be observed, in examining the Fair Labor Standards Act of 1938, that the words "affecting commerce" are not used and in Fleming v. Arsenal Bldg. Corporation, D.C.S.D.N.Y., 38 F.Supp. 207, 211, Judge Woolsey called attention to this fact and said: "The Fair Labor Standards Act does not, however, as does the National Labor Relations Act, extend the limit of the federal jurisdiction to any act 'affecting commerce.' "

■ In Gerdert v. Certified Poultry & Egg Co., supra, the court said: "The Court definitely concludes that the Fair Labor Standards Act does not attempt to regulate local transactions which merely *affect* interstate commerce except in the matter of production of goods for commerce or the sale of goods to be shipped, sold, and delivered in commerce, or intended to be shipped, sold, or delivered in interstate commerce."

■ In Fleming v. Goldblatt Bros., D.C.N.D.Ill., 39 F.Supp. 701, 703, Judge Sullivan said:

"Application of the Act is determined by the activities of each individual employee, not by the activities of the employer, and only those 'employees * * * engaged in commerce or in the production of goods for commerce' come within the terms of the Fair Labor Standards Act.

\* \* \* \* \*

"The purpose of the Act is to eradicate from interstate commerce the evils attendant upon low wages and long hours of service in industry."

In Gerdert v. Certified Poultry & Egg Co., supra, the court also stated, with reference to a case very similar to the case at bar, as follows: "It is argued that the employees of the defendant, when hauling the goods from the boat or the railroad freight depot, and when unloading commodities from the interstate trucks into the store, were engaged in interstate commerce. The Court cannot approve this contention. When the interstate carrier delivered the goods to the defendant the interstate commerce ceased. Any movement thereafter of said goods was purely intrastate. A delivery of the goods to the employee of the defendant was, of course, a delivery to the defendant. The interstate transportation had ended."

■ It is, however, the contention of the defendants that even under the stipulated facts, the operation of the warehouse is not the operation of a retail business. The fact that Veazey Drug Company has twenty retail stores and it is more convenient for the company to supply the various stores from a central warehouse, does not in anywise detract from the retail feature of the business. Before a retail store can *sell* its merchandise, it must *receive* the merchandise. It marks the retail price on the various articles and places them upon its shelves, before it sells them to the public. It makes very little difference whether the merchandise is received and marked in the warehouse, on the sidewalk in front of the store, or in the store itself. These are all essential elements of the retail business.

■ There is no basis for the contention of the defendants that the mere operation of the warehouse constitutes a business other than that of a retail business. It is apparent, also, that the merchandise absolutely came to rest so far as the transportation feature is concerned, *before it was checked in* by the checker and *received by the employees* of the plaintiff.

The constitutionality of the Fair Labor Standards Act of 1938 is not involved. It certainly was not the intention of Congress to legislate beyond its powers, and to presume that Congress intended to enact a law to regulate commerce other than interstate commerce would be a presumption unfair to Congress. The natural presumption is that Congress acted within its powers and its power to regulate commerce is limited to commerce between the states and with foreign nations. Right and power to regulate commerce wholly within a state were reserved to the state.

The Supreme Court, in the decisions hereinbefore referred to, specifically held that acts of commerce should not be so construed as to make that which is solely intrastate commerce, interstate commerce. The language of the statute should be given a fair and reasonable meaning, and certainly in construing an act of Congress, it must be presumed that Congress has acted within its constitutional power.

There is a definite line of demarcation between intrastate commerce and interstate commerce. If the edge of the dock and the rear end of the truck constituted this line and the driver of the truck and his helpers remove the goods to this line and they were received onto the dock side of the line by the defendant employees, to contend that said employees were acting in interstate commerce is certainly "pushing" the construction of the statute to an extent not contemplated by the legislative body.

Therefore, if the plaintiff is not engaged in interstate commerce, its employees are not subject to this Act, and even though incidentally or indirectly engaged in interstate commerce, if its business is entirely that of a retailer, then, under the exemption clause, the Act is not applicable.

It is the judgment of this court that neither the plaintiff nor its employees are engaged in interstate commerce; that the plaintiff's business in its entirety is retail; and, that the Fair Labor Standards Act of 1938 is not applicable.

Findings of fact, conclusions of law, and a form of judgment, consistent with this opinion, may be submitted within fifteen days from this date.