**WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. L. WIEMANN CO.**

No. 8332.

Circuit Court of Appeals, Seventh Circuit.

Nov. 12, 1943.

Frederick U. Reel, Douglas B. Maggs, Bessie Margolin, and Morton Liftin, all of Washington, D. C., and Frank J. De-

lany and Victor M. Harding, both of Chicago, Ill., for appellant.

Morris Karon and Philip Weinberg, both of Milwaukee, Wis., for appellee.

Before SPARKS, MAJOR and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

The Administrator of the Wage and Hour Division, United States Department of Labor, instituted this civil action under section 17 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 217. It sought to restrain appellee from violating the Act. The District Court made a special finding of facts, stated its conclusions of law thereon, rendered its judgment favorable to appellee and dismissed the complaint on the merits. From that judgment this appeal is prosecuted.

The substance of the rulings complained of is that appellee's warehouse and central office employees are not engaged in interstate commerce, but are engaged in a retail establishment within the meaning of section 13(a) (2) of the Act.[1]

The following facts are incorporated in the findings and are supported by substantial evidence. Appellee is a Wisconsin corporation which owns and operates sixteen retail stores in that State, twelve of which are located in Milwaukee and the other four in Fond du Lac, Green Bay, Racine and Madison. It also owns and operates in the city of Milwaukee a two-story building erected in June 1938, which is known as its general office and warehouse. Prior to such erection a part of one of its stores in Milwaukee was used for offices for the executives of the company, as well as for storage of merchandise to be redelivered to the other stores.

On the first floor of this general office and warehouse, three buyers have desk space; the balance is warehouse space devoted to the receipt, storage, and transfer of goods, in which work four employees are engaged. The second floor contains the private offices of appellant's officers, and desks for the clerical staff of six female employees. From here the executives supervise generally the activities of the company.

This office and warehouse is not open to the general public. No goods are sold or displayed there. Merchandise is ordered for delivery to this warehouse in order to save freight charges, by reason of larger volume shipments, and because manufacturers are often not willing to ship small quantities which would satisfy the requirements of an individual retail store. From 80% to 85% of all merchandise purchased by the company is shipped in from outside the State of Wisconsin. The manufacturers, rather than wholesalers or jobbers, supply ninety per cent of the company's merchandise.

The officials of the general office control the purchasing. They are assisted by the clerical employees, a part of whose work involves procuring and paying for merchandise. The buyers make up what is known as a listing for each manufacturer from whom goods are regularly purchased. For ready reference these listings are made up in permanent form, and are also mimeographed upon order blanks which are supplied to the manager of each store for use in making his selection when ordering merchandise. Orders placed by store managers are made out in duplicate, one copy being retained by such manager, the other forwarded to the general office for approval or disapproval. Unless an order from a single store is consolidated with those from other stores on the same manufacturer into a larger order, the order which has been executed by the store manager, upon its approval, is sent on to the manufacturer. However, when orders of various stores are consolidated, one new order is made by combining them. Consolidated orders usually specify the warehouse as the place of delivery. Twenty per cent of the merchandise purchased by the company is delivered in the first instance to the warehouse for a division and distribution among the various stores.

All warehouse employees perform work necessary to the receipt of merchandise and its distribution and transfer to the individual stores. Goods are delivered to the warehouse directly from the factory by motor carrier, or by a combination of rail and motor carrier. There is no unloading platform at the warehouse. The merchandise is unloaded at the warehouse to

---

[1] 29 U.S.C.A. § 213. "Exemptions.

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *".

the floor of the warehouse. The warehousemen have instructions from the officers of defendant not to assist in unloading the trucks. After unloading, the merchandise is unpacked and checked and placed in the appropriate bin which has been assigned by appellee to the retail store requesting the shipment, or it is placed upon shelves for a later transfer to the bins.

Invoices pertaining to shipments of merchandise come in by mail and are checked against orders in the general office to determine that the company is being properly charged. The retail price is figured at the general office and noted on the invoice, as is also the appropriate part of the purchase price and freight expense to be charged to each store. A "distribution" is stamped upon the invoices, indicating the division of the shipment among the various stores. The invoice is then transmitted from the general office employees to the warehousemen.

When invoices have been checked by the warehouse employees against the goods actually delivered, they approve and forward them to the general office for payment. These employees also mark containers of merchandise with the retail selling price which has been figured in the general office. Each shipment of merchandise from the warehouse to the retail stores is recorded by warehouse employees upon an invoice charging the stores with the merchandise sent them. The average stay of goods in the warehouse is approximately ten days. Shipments are received by and sent out from the warehouse almost daily.

A small part of the work of the girls in the office is the making out of orders or invoices and paying for the goods which have been received from outside the State. The greater portion of their time, however, is used in taking dictation, typing letters, checking invoices, bookkeeping, computing and checking the salaries of more than four hundred employees in appellee's sixteen stores, preparing sales statements of the stores, checking bank statements and deposit slips, taking care of callers at the office, preparing inventory records and insurance reports, and at certain times of the year preparing income tax reports, O. P. A. reports, and other State and federal reports. More than 80% of their time is devoted to the retail functions of the appellee.

The District Court concluded that appellee's retail stores and general office and warehouse building together constituted a single retail establishment, whose selling was wholly in intrastate commerce at retail; that its warehouse employees were not engaged in interstate commerce, or in a process or occupation necessary to the production of goods for interstate commerce; that their duties and activities did not bring them within the purview of the Fair Labor Standards Act, and were not covered by that Act; that all goods delivered to the warehouse came to rest upon delivery to the warehouse, and their interstate commerce journey ended when they were unloaded from the trucks at the warehouse door. The court further concluded that the six clerical employees in the general office were engaged in performing clerical work incidental to the retail functions of appellee's business, which was a retail establishment, all of whose selling was in intrastate commerce, and the activities of such clerical employees were exempt under section 13(a) (2) of the Fair Labor Standards Act.

There seems to be no substantial controversy as to the truthfulness of the facts found, and we think they fully support the conclusions of the District Court.

Appellant insists that appellee's warehouse and central office employees are engaged in interstate commerce, and in support of that contention he relies upon Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. ——; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d 778; and Walling v. American Stores Co., 3 Cir., 133 F.2d 840. The same cases are relied upon by appellee to support its contrary contention in this respect.

The Jacksonville case involved the business of a wholesaler and not a retailer, and the Supreme Court held that goods shipped to a wholesaler's warehouse, not purchased in response to prior orders or contracts from his customers, but purchased merely in anticipation of future orders or contracts from customers for their immediate and future needs, were not in fulfillment of prior orders. It further held that where, as there, such goods are delivered to the wholesaler's warehouse, interstate commerce ends, and the goods must be treated like the goods acquired and held by a local merchant for local distribution. The court further added [317 U. S. 564, 63 S.Ct. 336, 87 L.Ed. ——]: "We do not mean to imply that a *wholesaler's course of business based on anticipation of*

*needs of specific customers*, rather than on prior orders or contracts, *might not at times* [our emphasis] be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' within the meaning of the Act." We can readily visualize such a "course of business" on the part of a wholesaler which might establish a continuity in transit. However, the court held that it was not present in the Jacksonville case, and with more reason we think there is no such course of business disclosed here. In the case at bar there is shown no wholesaler, no prior orders and no course of business based on anticipation of needs of any specific customer.

Appellant seems to construe the "lists" of needed goods, forwarded by the several retail stores to the warehouse, as orders of customers. This we think is not a fair construction. The retail managers were in no sense customers of the warehouse. They merely sent their lists to the warehouse of the goods they needed or would likely need in the near future. These lists never became orders until they were approved by the warehouse and forwarded by it to the manufacturer. The retail managers and the warehousemen, none of whom did any wholesale business, were a part of one concern, and there is no evidence that any prior customers' orders were involved.

The Goldblatt case was decided by this court, and we think it fully supports the rulings of the District Court in the case at bar, in so far as it deals with commerce which has come to rest at its destination.

The American Stores case, supra, involved a large holding company operating directly and through subsidiaries throughout many states, in interstate commerce. It engaged not only in retailing through its 2300 stores, but it also manufactured and processed food products, operated canneries, machine shops, printing shops, warehouses and many other business activities in numerous states. Its sales were not only to the public but to subsidiary and controlled corporations who were separate legal entities who made separate tax returns. That company sought exemption for its warehouse and factory employees who were engaged in interstate commerce, by claiming that the warehouse and factories were all part of its retail establishment. The court there held that even though such a large concern be considered a single

establishment, it was more than a retail establishment, for it was manufacturer, processor, transporter and distributor, and for that reason the court held that the warehouses were not a mere adjunct of the company's retail establishment. We think the facts in that case are in no way analogous to the facts here presented. It is fair to say that that court declined to follow this court's ruling in the Goldblatt case. If the decision in the American Stores case be construed as supporting the broad doctrine that after goods in interstate commerce have come to rest within the state of destination, they remain, nevertheless, in interstate commerce merely because they are intended to be moved again at some time to retail stores in the same state, it would seem that the case stands alone without support of other authority. Certainly the Jacksonville case enunciates no such doctrine. See also Higgins v. Carr Bros. Co., 317 U.S. 572, 63 S.Ct. 337, 87 L.Ed. ——; Allesandro v. Smith Co., 6 Cir., 136 F.2d 75; Veazey Drug Co. v. Fleming, D.C., 42 F.Supp. 689.

■ Appellant's main contention in this case is based upon the Administrator's Interpretative Bulletin No. 6, relating to section 13(a) (2), issued December, 1938, and revised in June, 1941. In the revised interpretation he construed the scope of this section to the effect that (1) the unit store constitutes the retail or service establishment contemplated by the exemption; (2) the term "establishment" refers to a physical place of business and is not synonymous with the words "business" or "enterprise" as applied to multi-unit companies; and (3) the exemption does not apply to warehouses, central executive offices, or nonretail selling units which distribute to or serve stores.

From his construction of the terms "unit stores" and "establishment" he bases his conclusion that the employees at the warehouse are engaged entirely in interstate commerce. Upon such construction he, argues that since the warehouse is neither a unit store nor an establishment as contemplated by the statute, and since it, with the retail stores, cannot be considered as a unitary business or enterprise, it necessarily follows that the employees at the warehouse are engaged incidentally in moving the wares to the unit stores, and hence it must be concluded that interstate commerce does not end until delivery at the unit stores.

The original interpretation gave no such limited definition to the terms "unit store," and "establishment," except with reference to one who, wholly or partly, was concededly engaged in selling goods moving in interstate commerce; nor did it, by its definitions of those terms, attempt to extend the point of delivery with respect to those dealing solely in intrastate commerce; nor did it say that a warehouse or central executive offices should not be considered a part of a unitary business or enterprise which is engaged solely in intrastate commerce. Implications to the contrary are clear and numerous, and we think the same may be said with respect to the revised bulletin, except wherein the Administrator now seeks to apply to the facts in this case his more limited definitions of the words "unit store" and "establishment" to all commerce both interstate and intrastate. We think that neither the Act nor the interpretations of the Administrator can be reasonably thus construed. In support of this conclusion, we refer to paragraph 23 of the original interpretation which contains the following language:

"As pointed out previously, the fact that no exemption is available under section 13(a) (2) does not mean that the act necessarily applies. It is *first* (our emphasis) necessary to determine whether the employee is engaged in interstate commerce or in the production of goods for interstate commerce within the meaning of sections 6 and 7 * * *. Section 13(a) (2) * * * exempts all employees engaged in a particular type of establishment."

This precise language again appears in paragraph 43 of the revised interpretation. Now, instead of *first* determining whether the warehouse and office employees are engaged in interstate commerce, as required by both of his interpretations, the Administrator *first* defines certain unambiguous words of the statute in such manner as to change the point where interstate commerce, moving to an intrastate retail dealer, ends. That is to say, he fixes the several retail stores as the places where interstate commerce ends, instead of the warehouse from which the several stores are serviced, notwithstanding the fact that neither the warehouse nor any of the unit stores has ever sold or otherwise disposed of any wares in interstate commerce. The manifest intent and effect of such interpretation is to make all warehouses and office buildings of any multi-unit enterprise, engaged solely in intrastate business, amenable to the Fair Labor Standards Act, if such warehouse and office building is separated from its unit stores. This we submit was not the intention of Congress, nor is it a fair construction of either bulletin when considered as a whole.

It is interesting to note that the Administrator filed this complaint on May 20, 1941, and his revised Interpretative Bulletin No. 6 was not promulgated until some time the next month, the exact date not being disclosed. It is unnecessary for us to assert or deny the Administrator's legal right to promulgate at any time an interpretation of any statute affecting his administrative duties. For the purpose of this argument we assume the existence of such right, if it is reasonably and fairly exercised. However, it is unfortunate that it was thought expedient and necessary to issue the revised bulletin within such a short time after this action was filed. That fact should be considered with all other pertinent evidence in determining the intention of Congress in enacting the statute in 1938, in view of the fact that the Administrator, in December of that year, issued the original Interpretative Bulletin No. 6 which was in force at the time this complaint was filed. So far as the facts here involved are concerned, it is a fair interpretation, and it did not support appellant's cause of action. It, as well as the statute, essays to deal only with employers who are engaged in both interstate and intrastate business, or solely in interstate business. This must also be true of the revised interpretation, otherwise the Administrator has clearly exceeded his authority, and misconstrued both interpretations in their application to this cause.

The words of the statute are plain and unambiguous. Subsection (a) provides that sections 206 and 207 of the Act shall not apply with respect to "(1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator); or (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * *"

It should be noted that the Administrator is not authorized to delimit by regula-

tion any of the terms in this subsection, except those contained in subdivision 1. However, he has not, by Bulletin 6, attempted to define or delimit any word or term in that subdivision, but by the parenthetical clause in that sublivision he assumes authority to define and delimit the plain and unambiguous words of subdivision 2 by promulgating the order that the "unit store" constitutes the retail or service establishment contemplated by the exemption; and rules that the word "establishment" used in subsection (a) (2) refers to a physical place of business and is not synonymous with the words "business" or "enterprise" as applied to multi-unit companies. Hence, he concludes that the exemption here claimed does not apply to warehouses, central executive offices, or nonretail selling units which distribute to or serve the unit retail stores, notwithstanding the fact that appellee is a Wisconsin corporation, and is legally regarded as an entity, both as a mercantile and as a taxable unit, and none of its employees in any of the stores or in the warehouse and office building are engaged in retailing or servicing interstate commerce.

We are unable to perceive the source of appellant's authority for ruling that the word "establishment," as used in the Act, refers to a physical place of business and does not refer to a "business or enterprise as applied to multi-unit companies," dealing wholly in intrastate business, and does not apply to appellee's warehouse and central executive offices, although the District Court found that such warehouse and offices constitute component and necessary parts of appellee's unitary business. The District Court found nothing in the Act, nor do we, to indicate such intention on the part of Congress, nor any language therein which would permit of such construction. We recognize the right and duty of the Administrator to construe the language of Congress, in Acts pertaining to his department, if such language is fairly subject to more than one interpretation, but where the meaning is definite and clear, and the language is not fairly subject to more than one interpretation, it cannot be altered in any manner except by Congressional action, certainly not by administrative or judicial legislation. See Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90; Duncan v. Montgomery Ward & Co., D.C., 42 F.Supp. 879.

 We think that appellee is a retailer engaged solely in the retail business within the State of Wisconsin, and that its retail stores and general office and warehouse building together constitute a single retail establishment (see Spielmann v. Industrial Commission, 236 Wis. 240, 295 N. W. 1); that appellee's four stock boys employed in the warehouse are not engaged in interstate commerce, and that the six office girls employed in the general office perform only clerical work incidental to the retail functions of appellee's business, which is exclusively intrastate commerce, and are not subject to the provisions of the Fair Labor Standards Act.

The judgment is affirmed.