## WALLING v. WARD'S CUT-RATE DRUGS.
### Civ. No. 931.

District Court, N. D. Texas,
Dallas Division.

Feb. 11, 1944.

Douglass B. Maggs and Archibald Cox, both of Washington, D. C., Llewellyn B. Duke and Earl Street, both of Dallas, Tex., for plaintiff.

J. Manuel Hoppenstein, of Dallas, Tex., for defendant.

ATWELL, District Judge.

This is a suit brought by the Administrator to enjoin the respondent from violating provisions of the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.

The defendant is a partnership. Up to September 3, 1943, it was a Texas corporation. It has a warehouse and office in Dallas, Texas, from which it orders, and to which it receives, handles and distributes drugs, drug products, tobacco and other goods from both within and without the state of Texas. No retail nor wholesale sales are made at the warehouse, or, by any of the employees who work therein, except by the manager and buyer of the tobacco department who devotes part of her time to making sales in the retail stores. The warehouse is physically separated from the retail units. There are eight of such units in Texas. Five are within the city of Dallas, two in Fort Worth and one in Austin.

Substantially all of the goods handled and sold in the units move through the warehouse which is operated exclusively for those units. No sales are made at wholesale to anyone. From January 1, 1942 to June 30, 1943, purchases and receipts of goods into the said warehouse amounted to approximately $849,642. Approximately $426,010, or, 50.1% was ordered and received direct from points outside of Texas. Approximately $423,614, or, 49.9% of the total was ordered and received from points within Texas. Approximately $742,689 in the tobacco department was handled. $36,397, or, 4.9% was ordered and received from outside of Texas, and about $706,299, or, 95.1% from points within Texas.

There are eleven employees at the warehouse. Some of them spend a part of their

time in connection with the ordering and receiving and handling of goods that come from without Texas. Their duty being in connection with storing and handling, and distribution to the units; the making and keeping of books and records pertaining thereto, and the keeping of records pertaining to the selling units. Goods are ordered and received by such employees as are so engaged from both within and without the state, nearly every working day. Frequently a number of orders to different out-of-state suppliers are mailed from said warehouse in one day, and frequently shipments are received from several out-of-state suppliers on the same day.

Purchases of goods are made in less-than-carload lots. Warehouse employees keep watch as to the volume of stock on hand, and when an item is running low that fact is reported to the warehouse manager and an order is placed. Deliveries are made to the warehouse floor by motor freight lines and railway express. An employee receives such shipment of goods at the warehouse. Such employee compares the number of packages with the number shown on the freight bill, signs the delivery receipt, breaks open the cases and checks the contents against the original order; also he checks the quantities billed in the invoices against the receiving tickets, or, the original copy of the order. The goods so received are placed in storage space on the first floor, or, are taken by the elevator to the second floor where they are shelved, or, receptacled and removed from original cases. In a few instances where a supply was immediately necessary it was sent to the unit where it was needed.

The employees fill the orders for the units, place them in containers and take them to the first floor where they are loaded in the defendant's delivery truck and taken to that particular unit.

A warehouse employee, in addition to other office duties, makes up the payroll for all employees in all of the store units and takes and transcribes letters to suppliers and other business contacts both within and without the state. Another employee performs all the duties necessary to ordering, receiving and distributing of tobacco and tobacco products. Stock is sent to the unit upon request by the manager of that unit. No charge is made against the individual unit. The entire accounting is

done in the warehouse and the entire business is operated as a single entity.

The warehouse employees receive a weekly salary, regardless of hours worked. They usually work more than forty hours in each week and receive no compensation in addition to their regular salary.

The general ledger, as well as all the subsidiary books, are kept in the warehouse. The payroll for all of the units, where there are approximately sixty employees, as well as internal revenue taxes, social security taxes, income taxes, and all of the other business transactions, save and except sales, are made out and transacted by the employees who are in the warehouse. The employees engaged in the warehouse produce no goods and do no work in interstate commerce. Their work is incidental to the retail business.

This retail business is multi-unit, and includes the warehouse which is a necessary part of its intra-state business. That business is the operation of eight mentioned retail stores.

The foregoing observations are found as the facts from the stipulation and oral testimony.

The confusion that seems to have arisen in the decisions is the result of differences, though they may be slight, in facts. The fundamentals of commerce have not been altered, nor has the reach of the Wage and Hour statute been changed. It operates only upon employees who are engaged in interstate commerce. The exception with reference to retail establishments seems to be well recognized and preserved. A decision cannot be said to be determinative unless there is an application of the law to identical facts. A decision which deals with multi-units with a segregated warehouse would be of no assistance in a similarly styled cause where the facts are different. Brands do not determine breeds. The same brand might appear on a hereford, and a durham, and a jersey, and a longhorn. Such cases as Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176; Jehs v. Singer Sewing Machine Co.,[1] D.C.N.D.Okl., October 16, 1941; Veazy Drug Co. v. Fleming, Adm'r, D.C., 42 F. Supp. 689; Duncan v. Montgomery-Ward & Co., D.C., 42 F.Supp. 879, 881; Allesandro v. C. F. Smith Co., 6 Cir., 136 F.2d 75; Walling v. Goldblatt Bros., 7 Cir., 128 F.2d

---

[1] No opinion for publication.

778; Walling v. Sanders, 6 Cir., 136 F.2d 78; White v. Jacobs Pharmacy Co., D.C., 47 F.Supp. 298; Walling v. American Stores Co., 3 Cir., 133 F.2d 840; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Walling v. John J. Casale, Inc., D.C., 51 F.Supp. 520; Moses v. McKesson & Robbins, D.C., 43 F.Supp. 528; Walling v. Emery Wholesale Corp., D.C., 49 F.Supp. 192; Quendag v. Gibson, D.C., 49 F.Supp. 379; Walling v. L. Wiemann Co., 7 Cir., 138 F.2d 602, seem to be well reasoned, and Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, did no more than modify and affirm Fleming v. Jacksonville Paper Co., 128 F.2d 395, by the Fifth Circuit; nor did it change any of the basic principles which have heretofore been recognized as determining interstate and intrastate commerce. The speaking Justice, carefully choosing his words, decided a case which dealt with a wholesaler, and called attention to the fact that a temporary pause, of goods on their way to the buyer, at the wholesaler's warehouse, did not render them at rest. And that a wholesaler ordering a specific sort of paper receptacles for a particular customer, could not be permitted to claim that those receptacles ceased to be commerce after they reached the wholesaler's possession, since they were on their way to the customer.

 There is nothing in the Jacksonville case, it is thought, that changes or interferes with the right of the retailer to buy goods outside of the state and have them delivered in the state in his place of business for such use as he may see fit to make of them. That he has them put in a warehouse against the day of their distribution to a different unit from the warehouse itself, both of which belong to him, is his affair, and does not create another period of unrest to be tacked onto their journey in commerce.

That portion of the merchandise which came to rest, from out of the state, in the defendant's warehouse, ceased to be interstate commerce after such conclusion.

The inspection, counting, and placing upon shelves, and carting to and from shelves, as well as the writing of the order therefor, the payment therefor, and the keeping of the books showing such transactions, was the performance of labor on goods at rest. In the transportation and bringing of such goods to such status, the defendant had no part other than to order and to pay for.

The maintenance of a warehouse by a retailer cannot make him subject to a statute which is manifestly not intended for retailers, nor to a statute which has no authority to, nor, does it attempt to deal with intrastate dealers. The fact that a retailer buys a portion of his goods in other states, which goods are delivered to him within his place of business, whether it be called storage, or, a retail store, or, whether it be called a warehouse, or, a selling unit, is immaterial. It does not change the fundamental that interstate commerce retains its character only while it is such, and, loses that character when it comes to a permanent rest. That rest is the resultant of delivery to the buyer. When the buyer receives it in his place of business the voyage is complete. The clerk who counts those goods, receipts for them, and puts them on shelves, or, in receptacles, is not a handler of interstate commerce. They have lost that characteristic when he takes over. Nor does the mere fact that a provident retailer seeks to keep his stock replenished by ordering when inventories get low, that he may meet the needs of his trade, and keeps such replenishing stock in a warehouse for that purpose, make the Fair Labor Standards Act applicable.

It follows, as a conclusion of law, that restraint in the manner prayed, must be refused.